```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3    UNITED STATES OF AMERICA,        )
                        Plaintiff,     )
 4                                     )
      vs.                              )  No. 16CR10320-GAO
 5                                     )
      CHRISTOPHER HALFOND,             )
 6                        Defendant.   )

 7

 8

 9

10
                 BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
11                  UNITED STATES DISTRICT COURT JUDGE
                           SENTENCING HEARING
12

13

14

15            John Joseph Moakley United States Courthouse
                          Courtroom No. 22
16                        One Courthouse Way
                      Boston, Massachusetts 02210
17

18                         April 29, 2019
                            10:42 a.m.
19

20

21
                    Kathleen Mullen Silva, RPR, CRR
22                       Official Court Reporter
              John Joseph Moakley United States Courthouse
23                  One Courthouse Way, Room 7209
                      Boston, Massachusetts 02210
24                 E-mail: kathysilva@verizon.net

25            Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3            United States Attorney's Office

 4            AUSA James E. Arnold

 5            John Joseph Moakley U.S. Courthouse

 6            Boston, Massachusetts 02210

 7            617.748.3603

 8            for the Government

 9

10            Kevin L. Barron, Esq.

11            50 Congress Street, 6th Floor

12            Boston, Massachusetts 02109

13            617.407.6837

14            for Defendant

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.  United States District Court
 3     for the District of Massachusetts.  Court is in session.  Be
 4     seated for a sentencing in the case of United States v.
 5     Christopher Halfond, 16-10320.
 6            Would counsel identify yourselves, please.
 7            MR. ARNOLD:  Good morning, Your Honor.  Jim Arnold on
 8     behalf of the United States.
 9            MR. BARRON:  Good morning, Your Honor.  Kevin Barron
10     on behalf of Christopher Halfond, who stands to my left.
11            THE CLERK:  And from probation.
12            PROBATION:  Good morning, Your Honor.  Ryan Fox.
13            THE COURT:  Good morning.  You may be seated.
14            Mr. Halfond appears this morning for sentencing on his
15     conviction of one count of conspiracy to distribute 50 grams or
16     more of methamphetamine and one count of distribution of 50
17     grams or more of methamphetamine.  The conviction is coming
18     upon the tender of a plea of guilty to those offenses.
19            I have a final presentence report prepared by our
20     probation office, and I have memoranda from both the defendant
21     and the government.  Included in the submissions are letters on
22     behalf of the defendant, one by himself and one by his mother.
23            I think that runs the gamut of the presentations that
24     have been made in writing.
25            The presentence report, as is customary, presents a
```

1   proposed application of the United States Sentencing Guidelines

2   to determine what the guidelines would recommend as a target

3   range for sentencing.

4           Are there any issues that need to be resolved with

5   respect to the proposed application of the guidelines and the

6   resulting sentencing ranges?

7           MR. ARNOLD:  Nothing on behalf of the government, Your

8   Honor.

9           MR. BARRON:  No, Your Honor.

10          THE COURT:  Okay.

11          The guidelines I believe have been properly applied in

12  accordance with their terms.  I think there's no dispute from

13  the parties about that.  I have reviewed it and I adopt the

14  proposed application of the guidelines as set forth in the PSR.

15          That yields a total offense level of 29 and a criminal

16  history category of V.

17          The resulting recommendation from the guidelines for

18  consideration by the court is a sentencing range for

19  incarceration of between 140 and 175 months.  The guidelines

20  recommendation is a starting point for the consideration of an

21  appropriate sentence.  It's not the exclusive consideration.

22  So I'll hear your presentations concerning a precise sentence

23  based on the factors you think are important, starting with the

24  government.

25          MR. ARNOLD:  Yes, Your Honor.  The government, as set

forth in our sentencing memorandum, is recommending a sentence

of 156 months, Your Honor, which is roughly the mid level of

the sentencing guideline range for this defendant.

This defendant was a California-based supplier of

methamphetamine to a Boston distribution ring.  He sent

packages of methamphetamine to Matthew Metz on January 7, 2016.

Agents, after intercepting communications between this

defendant and Matthew Metz, executed a search warrant where

that package was being delivered, the package sent by this

defendant, and they seized 434 grams of 95 percent pure

methamphetamine.

As set forth in the PSR, as the government also

discusses in our sentencing memorandum, this was not the only

package sent by the defendant.  The government is agreeing with

the probation office, because with respect to other packages

the government doesn't have good evidence of what quantity was

involved in that, to take the conservative approach that this

case involves the defendant being held accountable for 434

grams of methamphetamine at 95 percent purity.

The defendant, as the court noted, has a criminal

history category of V.  He has a long history of criminal

convictions.  He has been in and out of the criminal justice

system since he was 13 years old.  He has prior convictions for

drugs, forgery, identify fraud, grand theft, and significantly

on the times that he was placed on probation, he has violated

1   that probation.  Perhaps even more troubling from the

2   government's perspective is the fact that there are six sets of

3   different charges that this defendant has incurred between 2007

4   and 2016 for which he never stood.  He fled and never returned

5   to deal with those charges.  And the government finds that

6   particularly disturbing for a defendant who is in his memo

7   arguing that he has turned the corner and is no longer a risk

8   to the community.  These can be found in the PSR paragraphs 135

9   to 140.  The government is not suggesting, the government has

10   no evidence whether the defendant was guilty of all of those

11   charges but the fact is he never addressed those charges.  And

12   the government finds that extremely disconcerting.

13          Added to that is the defendant's conduct since he's

14   been in detention in this case.  He has repeatedly obtained

15   disciplinaries.  He swore and threatened prison officials.  He

16   lit his shoe on fire.  He was found with contraband in his

17   cell.  And he's been disciplined for failing to comply with

18   prison officials' instructions.  All of those are reasons that

19   the government believes that a midlevel sentence of 156 months

20   is appropriate.

21          The government does want to address one of the grounds

22   that the defense has raised for a downward variance, namely

23   that they believe that the meth guideline is too serious.  The

24   government would note first that methamphetamine is a very

25   highly addictive drug.  It's dangerous.  The overdose deaths,

1    as we point out in our sentencing memo, are surging.  Between

2    2010 and 2014 there has been a doubling in overdose deaths.  In

3    2015 it had increased by another 30 percent.  Additionally, as

4    we recount in our sentencing memorandum, methamphetamine abuse

5    has dramatic physical and psychological impact on its users,

6    and some of those -- particularly the psychological impact --

7    last long after the drug abuse has ceased.

8            Now, one of the things the government -- and we will

9    note in this district, thankfully, we have not seen as many

10   methamphetamine cases as are seen in other parts of the

11   country, in Iowa, for example, Nebraska, Kansas, the West

12   Coast.  But we're seeing more of those cases now.  But we don't

13   have in this district, quite frankly, the experience with

14   methamphetamine that has been seen nationwide.

15           Congress, however, has made that determination based

16   on its nationwide view of the effects of methamphetamine on

17   communities.  And we set forth in our sentencing memorandum

18   that Congress has repeatedly viewed that the sentences for

19   methamphetamine need to be increased.  They've repeatedly

20   increased what the mandatory minimum should be and have lowered

21   the triggering amount associated with those mandatory minimums.

22   The Sentencing Commission has responded accordingly.  And one

23   of the things that Congress has drawn a distinction between is

24   the amount of methamphetamine that's required when it's pure

25   meth or meth actual versus when it's a detectable amount in a

1    substance or mixture.  And Congress has said that those should

2    be treated differently in recognition of the harms associated

3    with pure methamphetamine.

4         The analogy that defense counsel tries to draw to the

5    crack guidelines quite frankly doesn't hold.  First of all, the

6    crack guidelines drew a distinction of 100-to-1 differentiation

7    between crack and cocaine.  That was a distinction that even

8    the Sentencing Commission was on record saying this is not

9    supportable.  We don't have that same issue with respect to the

10   methamphetamine guideline.

11        Equally important, Congress altered crack cocaine both

12   in the Fair Sentencing Act of 2010 and again in the First Step

13   Act of 2018.  And when Congress made those changes with respect

14   to sentencing of crack cocaine, what's notable is that Congress

15   did not change the sentencing outcomes for methamphetamine,

16   which one can draw a conclusion that if Congress had been as

17   troubled with crack cocaine as they were -- excuse me -- with

18   methamphetamine as they were with crack cocaine, Congress would

19   have acted.  There's another aspect of crack cocaine that the

20   court is aware of, which is that the concerns associated with

21   crack cocaine was the disparate racial impact between crack

22   cocaine and powder cocaine.  That's just simply not present in

23   this case.

24        So while the government recognizes, as in all cases,

25   the Sentencing Guidelines are the starting point, the

1    government does not believe that this is a case for which a

2    categorical rejection of the methamphetamine guideline is

3    warranted or appropriate.  The government believes, as with

4    every case that appears before this court, the court can take

5    an individualized approach with respect to the guideline for

6    this defendant and make a determination within the range, above

7    the range, below the range, that the court makes in all cases,

8    but that there's no basis to reject on a categorical level the

9    methamphetamine guideline.

10          There are logical and rational distinctions between a

11    defendant who distributes 95 percent pure methamphetamine and a

12    defendant who is distributing methamphetamine at a

13    significantly lower ratio.  First of all, the harm to the

14    individual is significantly greater, and that's one of the

15    things we're seeing in terms of the overdose deaths is because

16    we're seeing more and more pure methamphetamine nationwide.

17    But that doesn't mean that because it's more dangerous and more

18    harmful, therefore, the defendant should be sentenced to a

19    lower sentence under the guidelines.  That doesn't make any

20    sense.

21          So the government's position, as I started with and

22    where I'll end, is the government recommends that this

23    defendant, taking into consideration all of the factors under

24    3553(a), and particularly his own past conduct and the

25    seriousness of the offense, need to deter others, recommends a

1    sentence of 156 months.

2         THE COURT:  Mr. Barron.

3         MR. BARRON:  Yes, Your Honor.  I'll start off with the

4    disparity issue.  I mean, when this case started, as Your Honor

5    will recall, the indictment alleged substance containing a

6    detectable amount.  And I think there is a letter from

7    Mr. Halfond to the court complaining that he hadn't gotten to

8    see his attorney for several months.  There was also some

9    negotiation between me and Ms. Beausey and we essentially

10   reached what we thought was an agreement, and then Ms. Beausey

11   went to California and the sessions memorandum was enforced.

12   And Your Honor may recall our unusual motion to have a Rule 11

13   hearing at the nearest opportunity and that the government had

14   managed that morning of the hearing to supersede with the

15   50-gram actual allegation.

16        There is one defendant in this case -- disparity

17   exists in this case.  There's one defendant who pled before the

18   superseding indictment by the name of Ponce.  He was using the

19   same methamphetamine.  The same methamphetamine was found with

20   him.  He was active in helping launder the money and actually

21   distribute the drugs and he's going to be charged on -- or he's

22   going to be sentenced on a lower offense level.

23        In Mr. Halfond's case, the 434 grams of a substance

24   containing would be level 28, and a substance -- and meth

25   actual would be -- is level 32 here.  The only reason we're at

1    level 32 and level 28 is we didn't get to plead soon enough.

2    That's a disparity, as easily as it can be made.  It's all in

3    the government's hands whether to charge one or the other.

4         Now, we're not asking Your Honor to make a sentencing

5    memorandum that looks like the decision out of the District of

6    Alaska that I quoted to Your Honor, and I said so in the

7    memorandum.  What we're asking Your Honor to do is to consider

8    that at least in this case a slight departure -- excuse me --

9    variance downward by two points would be sufficient to bring us

10   within the 120-month range.  And what are the reasons for that?

11   Well, the letters from Mr. Halfond and from his mother I think

12   are a good starting point as to why we might go outside the

13   guidelines other than the issue of some defendants being

14   sentenced in this case on a substance containing a detectable

15   amount of meth actual.

16        We have a person who has more unfortunate early years

17   than other people.  I think that should be accounted for to

18   some degree, because, you know, we have -- the very beginning

19   of his life is fraught with difficulty.  Not of a kind that one

20   encounters ordinarily.  I mean, the business -- we have

21   Mrs. Halfond here in the courtroom.  You know, the business of

22   trying to beat the mother to get her to miscarry and the

23   threats to kill.  Mr. Halfond is growing up, he's having

24   difficulty because of the lack of continuity.  He ends up at 11

25   or 12 in trouble, and the cycle starts.  We see this in a lot

1    of cases.

2         Now, that always leads to a question of, well, do we

3    need to protect the public or deterrence on safety on the one

4    hand or is the defendant's conduct to a degree understandable

5    because of an upbringing and is it a solvable problem?

6         Now, I think that Mr. Halfond's criminal record is not

7    nearly as dramatic as the government makes it look.  Paragraphs

8    126 to 130 show points calculated for a forged check, guilty,

9    probation; larceny over 250, ID fraud, guilty, probation;

10   fraud, the use of ID in Texas, eight months.  Paragraph 129,

11   two days committed in California for grand theft property.  And

12   then he has a narcotics conviction for which he served three

13   years for heroin, to which he was addicted at the time.

14        The history of his addiction is a very familiar story

15   in America now, the too easy availability of oxycodone or

16   related drugs I think applies in Mr. Halfond's case.  I'm not

17   arguing that he isn't responsible for it.  But somebody with a

18   rough start and some low grade mental illnesses is often

19   frequently involved in using drugs, which is why the letter

20   seems to be important and the report that Mr. Halfond does

21   well.  The letter itself shows a clear mind in somebody who is

22   being successfully medicated.

23        There are also the stories about Mr. Halfond

24   personally that although anecdotal, the mother is here to talk

25   about him.  Learning to read at a early age, teaching himself.

1    What's obviously a high intelligence and an ability to at least

2    respond -- anybody who has a mental illness of any degree is

3    better off being intelligent than not.  That's generally one

4    factor I think that is important.

5         So we have a defendant here whose criminal history,

6    although it scores 10 points, is not as serious as 10 points

7    might be in other cases.  I mean, there's no violence, no

8    robberies, no firearms, no beatings, nothing that would tend to

9    show that the defendant is a physical risk to the safety of the

10   community, other than his involvement with drugs.

11        Now, methamphetamine is a bad drug.  I mean, the

12   government has introduced some dramatic photographs to back

13   that up, and there is certainly a lot of trouble with

14   methamphetamine.  It's dangerous, as is fentanyl, as is heroin,

15   as are many other drugs, especially drugs with no medical use.

16   They have a heavy cost.  And the problem is that some areas of

17   the country, particularly San Diego, are amphetamine centers.

18   I've seen more than one of these cases, as has my brother,

19   where the Postal Service needs to only look at a package going

20   from San Diego to somewhere else in the country with a phony

21   return address on it.  That's probably enough to get the dog to

22   sniff the package.  The dog alerts and a warrant is obtained.

23   And there were some 64 such packages in this case.

24        I think Mr. Halfond's involvement in this case is

25   really sort of at the end of the spoke.  Mr. Metz had other

1    suppliers.  There's some back and forth here in the reply

2    memorandum and the government's sentencing memorandum.  I think

3    the government really is trying to say that he's responsible

4    for more, even though the government has objected.  The

5    government sent a letter on April 1 to probation making

6    corrections.  It wasn't formally styled as an objection.  So

7    there were additions to the PSR.  I added Mrs. Halfond's

8    information as well.

9          This was a very large conspiracy, I think as Your

10   Honor sees, and Mr. Halfond only knew Mr. Metz.  That's the

11   only connection is Metz.  Over the year and a half of

12   investigation, the government can only point to this period of

13   a few months of communication between Metz and Mr. Halfond.  So

14   it's -- he's a supplier to the conspiracy, and I don't think

15   that the guidelines would provide for a two-point reduction on

16   minor role as a supplier.  And yet on the other hand, the

17   analysis for role reductions is at least in part driven by

18   relative considerations.

19         Mr. Halfond did not drive this conspiracy as the

20   supplier typically would.  He supplied one person who had other

21   sources of supply.  And the problem is that Mr. Metz could go

22   to nearly anybody in California involved in drugs and get a

23   pound of methamphetamine for probably about $1,000.  That's

24   what I understand the going rate is there.  It's become

25   incredibly cheap.  It's made in over-the-border laboratories

1    and brought into the United States in any number of ways.

2        So Mr. Halfond's pound of methamphetamine to this

3    conspiracy is not as serious as the other defendants are in

4    actually controlling and running the conspiracy.  It's an

5    opportunistic sale of drugs to Mr. Metz.  He was dealing in

6    drugs nonetheless, but a ten-year sentence does follow

7    Congress's direction.  Congress made mandatory minimums, and

8    they applied a very strong mandatory minimum beginning at 50

9    grams meth actual.  The government has been able to indict

10   Mr. Halfond for that, and it should be a relative -- it's a

11   sufficient sentence.  I mean, these disciplinary reports in

12   prison, I think the way they're cast are somewhat difficult.

13   The shoe caught on fire because he was tattooing.  He was

14   making some kind of -- it's bad conduct, of course, to tattoo

15   in prison, but he owned up to it so somebody else wouldn't be

16   blamed.

17       The thing in the line, in the drug line where

18   Mr. Halfond -- where the nurse said, no, he didn't say that,

19   but the guard continued.  None of it's good to get a

20   disciplinary report but they're not perhaps as serious as the

21   government would like to make them.  Plus that, he was punished

22   by being put in the so-called hole or near solitary confinement

23   for a number of periods.  I don't think it makes Mr. Halfond

24   violent or difficult.  He doesn't have that history.  And I

25   think his mother writes that rather well.  Somebody like

1    Mr. Halfond, at least the individual deterrence component of

2    this, I think is well taken care of with a ten-year sentence.

3    The largest sentence he's ever had before has been three years

4    in California under a system that promotes early release.  The

5    federal sentence here is going to result in a lot of prison

6    time.  He will be in his forties -- well into his forties

7    before he is released with just a ten-year sentence.  His risk

8    of recidivism goes down significantly at that point.  I think

9    that Mr. Halfond's ten years would be a lot to protect the

10   public from further meth dealing and ten years is a strong

11   signal for general deterrence.  A ten-year sentence is a

12   significant sentence and adding three years to it seems

13   unnecessary in this case.

14           Thank you, Your Honor.

15           THE COURT:  All right.  Thank you.

16           Mr. Halfond, you have the opportunity to make a

17   statement now if you wish.  You don't have to if you don't want

18   to, but this is your chance to do so if you wish.  I note, as I

19   have already, I have read your letter, as well as your mother's

20   letter.

21           THE DEFENDANT:  All right.  Thank you, Your Honor.  I

22   feel that Mr. Barron has adequately spoken on my behalf.  I

23   agree with everything he said, and I think my letter -- did you

24   read my letter?

25           THE COURT:  Yes, I read your letter.

1            THE DEFENDANT:  I feel my letter probably conveyed my

2    overall state of mind currently and my goals for the future and

3    I appreciate your consideration, sir.

4            THE COURT:  Okay.  Thank you.

5            THE DEFENDANT:  Thank you.

6            THE COURT:  I think the statutory factors to be

7    considered in deciding on an appropriate sentence in this case,

8    as in probably most drug distribution cases, are fairly

9    obvious, that is, the nature and circumstances of the offense.

10   It's a very serious offense, as the government has pointed out,

11   causing real and extended harm in the community.  The

12   distribution of literally deadly drugs, and if not deadly,

13   certainly seriously harmful drugs is a very serious matter that

14   requires an appropriate response from the criminal justice

15   system.  Therefore, the related statutory factor of a just

16   punishment for the offense.

17            I think the papers reflect a common understanding by

18   prosecution and defense that criminal sentencing is not simply

19   therapeutic in the sense that it gives a person an opportunity

20   to reflect and reform, but it is intended to actually be

21   punitive in a backward-looking sense.  Those things point in

22   different directions, but they are both important parts of the

23   criminal justice system and of any sentence.

24            Another statutory factor is promoting respect for the

25   law.  I interpret that as perhaps having two different aspects.

1    One is to promote respect by the relevant defendant for the

2    law.  This defendant's criminal history is an unusual one.  I

3    would agree with Mr. Barron that an argument can be made that

4    the guidelines system inflates the seriousness to some degree.

5    On the other hand, the troubling aspect to me of the criminal

6    history is its persistence.  They're not all the greatest

7    crimes in the world or the most serious crimes in the world,

8    but they just kept happening.  It speaks to someone who is, I

9    think, not to overstate it or make it too scientific sounding,

10   a sociopath, just not conforming to the requirements.

11          So I don't rule out that promoting respect for the law

12   for the individual defendant here, as well as for people who

13   may be observing criminal sentencing and may be warned

14   themselves to stay away from criminal activity like this or the

15   punishment will be severe.  So both general and specific

16   deterrence I think are at play here.

17          I am concerned, not to overstate it, by the

18   disciplinary issues in the prison.  I note that some of them,

19   some of the incidents postdate Mr. Halfond's tender of a plea

20   in this case.  So that even after he had made that choice and

21   was awaiting the sentence, there was some difficulty in

22   conforming to the rules of the institution, and I don't want to

23   overstate it, but that is not a hopeful sign, I guess.

24          And I have considered seriously the letter.  I accept

25   that Mr. Halfond is making an effort to reform his life and to

1    turn it to more humane and self-fulfilling objectives.  I'm not

2    convinced he's there at this point, as the disciplinary

3    incidents suggest.

4         Let me just speak briefly about the ratio disparity.

5    There's two comments.  Mr. Arnold has actually made them.

6    Maybe there's two and a half.  *Kimbrough* addressed essentially

7    guidelines policy judgments, not Congressional policy

8    judgments, if I recall it correctly.  But in any event, there

9    is a difference, in my view, between the reform of the crack-

10   powder disparity and the narrower, as Mr. Arnold points out,

11   disparity, if it is that, between pure and non-pure

12   methamphetamine.

13        To note the disparity, the mathematical disparity sort

14   of begs the question, which is wrong.  In other words, knowing

15   no more, it isn't necessarily that the harsher punishment is

16   the wrong one.  It might be that the lighter punishment is too

17   light.  So I think people who find a basis of a disparity to

18   conclude that, therefore, the top should be brought down, I

19   don't -- more information would be needed in order to make that

20   conclusion as opposed to reject the proposition that the lower

21   range should be raised.  So I think just logically this is not

22   enough just to note the disparity.

23        And the second point is that it was really not a

24   mathematical disparity that drove the amendment of the crack

25   guidelines.  It was the sociological aspect and the impact of

1    those, as Mr. Arnold has pointed out.  The impetus for the

2    reform was when people realized the disparate impact that it

3    was having on communities of color as opposed to perhaps white

4    suburban defendants, who had a different drug of choice.  That

5    factor was absent in this case.  It's not clear that even the

6    same people who argued for the reform of the crack-powder

7    disparity would similarly -- because they oppose the disparity,

8    would automatically oppose this one as well.

9            I have considered, as I always do, the parsimony

10   clause, the introductory clause, the reminder that the sentence

11   should always be sufficient but not greater than necessary to

12   accomplish the goals of sentencing.

13           I do not think it calls for a variance from the

14   guideline range.  I think it does call for a sentence at the

15   low end of the range as opposed to the middle range as a

16   sentence.

17           So Mr. Halfond, if you'd stand, please.

18           Christopher Halfond, on your conviction of these

19   offenses and pursuant to the Sentencing Reform Act of 1984, it

20   is the judgment of the court that you be and you hereby are

21   committed to the custody of the Bureau of Prisons to be

22   imprisoned for a term of 140 months, the low end of the

23   guideline range.  That consists of equal terms on each of the

24   two counts of conviction to be served concurrently.

25           Upon your release from imprisonment, you shall be

1    placed on supervised release for a term of five years.  That

2    consists of equal terms on each of the two counts.

3          I would recommend to the Bureau of Prisons that you be

4    considered for participation in the residential drug abuse

5    program and any other available program addressing either drug

6    addiction or mental health issues.  I recommend further that

7    you be considered for participation in our probation office and

8    our court's CARE program on your release from custody.

9          While you're on supervised release, you shall comply

10   with all the standard conditions that pertain to that status.

11   Those are set forth in the United States Sentencing Guidelines

12   at Section 5D1.3C.  They are incorporated now by reference, but

13   they will be set forth at length in the judgment.

14         In addition to those standard conditions, you shall

15   comply with the following conditions of supervised release:

16   You may not commit any other federal, state or local crime.

17   You may not unlawfully possess any controlled substance.  You

18   are to refrain from the unlawful use of any controlled

19   substance, and you are to submit to at least one drug test

20   within 15 days of your release from imprisonment and at least

21   two periodic drug tests thereafter, not to exceed 104 tests per

22   year.  You are to cooperate in the collection of a DNA sample

23   at the direction of the probation office.

24         If directed to do so by probation during your

25   supervised release, you are to participate in any program for

1  substance abuse counseling or treatment or mental health

2  counseling or treatment.  Any drug program may include random

3  drug testing not to exceed 104 tests per year.

4       You may be required to contribute to the costs of any

5  programming along those lines based on your ability to pay or

6  the availability of third-party payment.  You are at all times

7  to use your true name and are prohibited from using any false

8  identifying information, including but not limited to aliases,

9  false dates of birth, false Social Security numbers and

10  incorrect places of birth.

11       I will not impose a monetary fine but there's a

12  mandatory assessment of $100 that is due on each of the counts

13  of conviction for a total of $200, and that is due forthwith.

14       THE CLERK:  Christopher Halfond --

15       THE COURT:  Wait, excuse me.  Mr. Barron.

16       MR. BARRON:  I'd request a recommendation, a

17  judicial -- does Your Honor accept judicial recommendations to

18  specific institutions?  I was thinking of Berlin or Danbury.  I

19  don't want him to go to Hazelton, if possible.  If Your Honor

20  made that recommendation, it might be helpful.  Berlin and

21  Danbury both have all security levels.

22       THE COURT:  It's not my practice.

23       MR. BARRON:  It would keep him close to his family.

24       THE COURT:  I will recommend that the Bureau consider

25  seriously the factor of being close to his family, but I do not

1  recommend specific institutions.

2          MR. BARRON:  Right, keep him as close in region to his

3  family as possible.

4          THE COURT:  Okay.

5          MR. BARRON:  Thank you.

6          THE CLERK:  Christopher Halfond, you have the right to

7  file a notice of appeal in this case.  If you do file an

8  appeal, you must file it within 14 days from the date the

9  judgment is entered.  Do you understand, sir?

10         THE DEFENDANT:  Yes.

11         THE COURT:  All right.  The defendant is remanded to

12  the custody of the marshal.

13         We will be in recess.

14         THE CLERK:  All rise for the court.  The court will be

15  in recess.

16  (Adjourned 11:18 a.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4   UNITED STATES DISTRICT COURT )

5   DISTRICT OF MASSACHUSETTS     )

6

7

8           I certify that the foregoing is a correct transcript

9   from the record of proceedings taken April 29, 2019 in the

10  above-entitled matter to the best of my skill and ability.

11

12

13

14

15  /s/ Kathleen Mullen Silva                    8/10/21

16

17  Kathleen Mullen Silva, RPR, CRR              Date
    Official Court Reporter
18

19

20

21

22

23

24

25